**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
DERWIN GERRARD HARRIS,              )
                                    )
              Plaintiff,            )
                                    )
      v.                            )        1:18cv378
                                    )
KATY POOLE, et al.,                 )
                                    )
              Defendants.           )
```

<u>**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion for Summary Judgment of Defendant Bikramjit Grewal, MD" (Docket Entry 43)[1] (the "Doctor's Motion") and the "Motion for Summary Judgment" (Docket Entry 47) (the "Prison Defendants' Motion") filed by Ronald Covington, Katy Poole, Beverly Stubbs, and Carol Torres (collectively, the "Prison Defendants").  For the reasons that follow, the Court should grant the Doctor's Motion and the Prison Defendants' Motion (collectively, the "Motions").

<u>**BACKGROUND**</u>

**I.  Procedural History**

Pursuant to 42 U.S.C. § 1983, Derwin Gerrard Harris (the "Plaintiff") commenced this action against Prison Defendants and

_____

    1  For legibility reasons, this Opinion uses standardized capitalization and spelling in all quotations from the parties' materials.

Bikramjit Grewal, MD ("Dr. Grewal," and collectively with Prison Defendants, the "Defendants") for acts and/or omissions amounting to deliberate indifference to Plaintiff's serious medical needs during Plaintiff's incarceration at Scotland Correctional Institution (the "Scotland C.I."). (Docket Entry 2 (the "Complaint") at 1-4.)[2] Dr. Grewal initially moved to dismiss the Complaint "pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure" and "Rule 9(j) of the North Carolina Rules of Civil Procedure." (Docket Entry 21 at 1.)[3] "[V]iewed in the light most favorable to Plaintiff with the benefit of all reasonable inferences," though, "the Complaint's allegations plausibly support a deliberate indifference claim, because they would permit a finding that D[r.] Grewal 'ignored [Plaintiff's symptoms], disregarded abnormal test results, and failed to treat any of [his] symptoms.'" (Docket Entry 36 at 7 (final two sets of brackets in original).) Accordingly, the undersigned recommended that the Court deny Dr. Grewal's "request for dismissal of Plaintiff's Section 1983 claim for deliberate indifference" (id. at 8). (See id. at 7-8.)

---

2  Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

3  Plaintiff submitted a sworn opposition to Dr. Grewal's dismissal motion. (See Docket Entry 27 at 6.)

"[H]owever, to the extent Plaintiff's Complaint [purports[4]] to state a claim against D[r.] Grewal for medical malpractice, that claim fail[ed] due to the absence of a certification compliant with Rule 9(j) or factual allegations sufficient to invoke the res ipsa loquitur doctrine." (Id. at 9.) The undersigned therefore recommended that the Court "dismiss any medical malpractice claim against D[r.] Grewal in the Complaint." (Id. at 11.) The Court (per United States District Judge Catherine C. Eagles) adopted both of these recommended rulings. (See Docket Entry 51 at 1 (permitting "Plaintiff's § 1983 deliberate indifference claim against D[r.] Grewal [to] proceed," but dismissing "any state-law medical malpractice claim or other claims asserted in the [C]omplaint against D[r.] Grewal").)

During the pendency of Dr. Grewal's dismissal motion, the parties commenced and completed discovery. (See Docket Entry dated Oct. 10, 2018 (establishing discovery schedule).) Following close of discovery, Defendants filed the Motions. (See Docket Entries 43, 47.) Plaintiff filed a response in opposition to the Prison Defendants' Motion (see Docket Entry 50), but not to the Doctor's Motion (see Docket Entries dated May 9, 2019, to present).

## II.  Factual History

As relevant to the Motions, the record reflects the following:

---

4 "Some question exists as to whether Plaintiff intended the Complaint to include a medical malpractice claim . . . ." (Id. at 8-9.)

**A.  Plaintiff's Allegations**

In his unverified Complaint, Plaintiff alleges that:

In August 2016, Plaintiff slipped on the sidewalk at Scotland C.I., hyperextending his right leg.  (Docket Entry 2 at 3.)  "Days later[, Plaintiff] put in a sick-call requesting to see a doctor acknowledging leg injury as serious."  (<u>Id.</u>)  "Over the next 8 months of not receiving adequate medical attention on several different occasions[, Plaintiff] spoke with Captain Covington as well as Captain Tor[res] seeking medical attention acknowledging them both [that Plaintiff] was dealing with excruciating pain with their response being 'put in an emergency sick-call' or 'they couldn't override medical.'"  (<u>Id.</u>)  In January 2017, Plaintiff wrote to Katy Poole, informing "her of the numerous complaints [that Plaintiff] had filed concerning [his] injury through the inmate grievance procedure, sick-calls, as well as 'emergency' sick-calls . . . Only to receive no response."  (<u>Id.</u> (ellipsis in original).)

Around 1 a.m. on January 12, 2017, "in intolerable pain[, Plaintiff] declared an emergency sick-call . . . and was seen in medical by Ms. Stubbs," who "was extremely rude and hostile while discussing [Plaintiff's] injury."  (<u>Id.</u>)  "While discussing [his] injury[, Plaintiff] acknowledged Ms. Stubbs [that] cool air aggravates [his] leg[, but] she prescribed [him] ice for 72 hours."  (<u>Id.</u>)  Plaintiff also requested crutches, stating that he "was

experiencing severe pain with every step[, but] she denied [that request]." (Id.)  "She didn't perform an adequate examination on [Plaintiff's] leg, and she charged [him] twice." (Id.)

In April 2017, Plaintiff "finally received an M.R.I. . . . and was taken to Central Prison on [June 23, 2017,] to receive the results." (Id.)  Dr. Grewal saw Plaintiff on this occasion, reviewing Plaintiff's M.R.I. and informing him that there "was no damage shown and no further medical attention pertaining to [Plaintiff's] leg was needed." (Id.)  "[Four] months later still dealing with the same pain[, Plaintiff] put in a sick-call at Whiteville Correctional[5 ("Whiteville C.I.")] where [he] was later seen by [a] doctor who reviewed [the] M.R.I. and [told Plaintiff that the] M.R.I. showed abnormal swelling which alone show [sic] signs of an injury." (Id.)  That doctor "couldn't understand why [Plaintiff] hadn't received further medical attention." (Id.) Plaintiff immediately submitted a grievance, and Whiteville C.I. conducted its own investigation, deciding "to get [Plaintiff] to an orthopedic immediately" (id. at 4).  (See id. at 3-4.)[6]  Since

_____

    5  By "Whiteville Correctional," Plaintiff apparently means "Columbus Correctional Institution," located in Whiteville, North Carolina, see, e.g., Columbus Correctional Institution, North Carolina Department of Public Safety, available at https://www.ncdps.gov/Adult-Corrections/Prisons/Prison-Facilities/Columbus-Correctional-Institution (last accessed Feb. 3, 2020). (See also, e.g., Docket Entry 44-1 at 64-65 (containing relevant medical records, identifying facility as "COLU").)

    6  This investigation apparently occurred on or about November
(continued...)

then, Plaintiff has "been receiving adequate medical attention." (Id. at 4.)

## B. Evidence Regarding Dr. Grewal

The evidence that Dr. Grewal submitted in support of his summary judgment request reflects the following:

Dr. Grewal served as an Orthopedic Surgeon in the Department of Orthopaedics at the University of North Carolina School of Medicine in June 2017. (Docket Entry 44-2, ¶ 3.) In this role, he occasionally saw patients at the Orthopaedic Clinic at Central Prison. (Id., ¶ 5.) However, he possessed no authority or involvement in determining which inmates received either appointments at this clinic or any "MRIs," physical therapy, surgery, x-rays, "or any other type of medical intervention." (Id.) "The way that [he] understand[s] the process is that inmates are referred to the Orthopaedic Clinic through the health care providers who treat the inmates in their prisons for general health concerns in the capacity of a primary care provider." (Id.)

The only time Dr. Grewal saw, examined, or treated "Plaintiff as a patient was on June 23, 2017 in the Orthopaedic Clinic at Central Prison. [Dr. Grewal] ha[s] had no other involvement in Plaintiff's care, and ha[s] never been requested to have any

---

6(...continued)
7, 2017. (See id. at 2 (stating that Plaintiff filed a grievance on "11/07/2017," in response to which "Whiteville C[.I.] did an investigation [and Plaintiff has] since then been receiving adequate medical attention").)

further involvement in Plaintiff's care." (Id., ¶ 6.)  When

Dr. Grewal treated Plaintiff in June 2017,

> he had already undergone an MRI study of his right knee. Plaintiff's MRI showed edema in the pre-femoral and infrapatellar fat pads, which the radiologist interpreted as likely being due to impingement.  This simply means that the Plaintiff had some swelling in the fatty cushion inside the knee.  This is a very non-specific finding, and can result from a variety of potential causes including overuse (excessive running for example), trauma (even very slight trauma such as bumping into an object), poor walking/running form, or overextension (from slipping while on one's feet for example).  It is not possible to prescribe treatment based solely on an MRI finding of fat pad edema because it is so non-specific. In fact, it is very possible for a patient to have MRI findings of fat pad edema and to have no symptoms from it at all.  It is also possible to have the same findings on an MRI that Plaintiff had and to have knee pain symptoms from a cause that is not related to the MRI findings. The findings on Plaintiff's MRI are not anything that would indicate surgery or any other invasive treatment.

> When [Dr. Grewal] examined [] Plaintiff on June 23, 2017, his symptoms were consistent with iliotibial ("IT") band disorder, and the proper treatment for that disorder is physical therapy, which [Dr. Grewal] prescribed. Medically, when [Dr. Grewal] evaluated [] Plaintiff, he was not a candidate for surgery because at that point [Dr. Grewal] did not believe that [] Plaintiff would benefit from surgery, and because surgery would not have been an appropriate first step in the treatment process of Plaintiff's symptoms.  During [their] appointment, [Dr. Grewal] prescribed physical therapy for Plaintiff, and [Dr. Grewal] explained to him that [Dr. Grewal] was prescribing physical therapy.  [Dr. Grewal] submitted [his] recommendation for physical therapy to the prison review process, and even did so under the "rush" category to be evaluated by prison officials within 7 days. [Dr. Grewal] told [] Plaintiff to participate in physical therapy and to follow up with the Orthopaedic Clinic as needed.

> After [Dr. Grewal] prescribed physical therapy for [] Plaintiff, the process of approving and implementing that physical therapy request was entirely outside of

[Dr. Grewal's] control. [Dr. Grewal] ha[s] never had and do[es] not have the authority or ability to schedule an inmate for physical therapy or otherwise enroll an inmate in physical therapy. Similarly, [Dr. Grewal] cannot obligate or compel prison officials to transport an inmate to physical therapy. The way in which [Dr. Grewal] can make a recommendation for an inmate to undergo physical therapy is by doing precisely what [Dr. Grewal] did for [] Plaintiff on June 23, 2017 — submitting that request to prison officials through the computerized medical records program.

[Dr. Grewal's] understanding of how the process works once [Dr. Grewal] prescribe[s] a treatment for an inmate is that the treatment request must be approved by prison officials by way of a Utilization Review process. [Dr. Grewal] ha[s] no involvement with the Utilization Review process. [Dr. Grewal] ha[s] no authority or control over anyone involved in the Utilization Review process or over anyone with any control over whether [Dr. Grewal's] treatment recommendation for an inmate is approved or implemented.

(Id., ¶¶ 7-10 (internal numbering omitted).)

In connection with that process, the "Health Services Policy & Procedure Manual" (the "Manual") for the North Carolina Department of Public Safety (the "DPS") contains a "Utilization Management Section [that] is designed to evaluate the appropriateness and medical necessity of services provided to [inmates]." (Docket Entry 44-3 at 1 (emphasis omitted).) Under its "Utilization Review (UR) Plan" (id. (emphasis omitted)), "[a]ll diagnostic/therapeutic procedures not being done by a Prisons primary care provider" require preauthorization, as do all "[s]cheduled inpatient admissions." (Id. at 2-3.) "A Utilization Review Request (UR) must be submitted by the facility providers for any service that requires precertification or prior authorization."

8

(Id. at 6.)  The DPS Primary Care Provider bears responsibility for "[c]oordinating all medically necessary services for inmates at the assigned institution" and "[r]equesting Specialty . . . consultations, diagnostic and therapeutic procedures as medically appropriate." (Id. at 8.)  The Manual further notes that "Primary Care Providers should be aware that not every specialist recommendation is necessarily appropriate. . . . After consultants offer opinions and treatment recommendations, Primary Care providers are responsible for reviewing consultant findings/recommendations and making decisions regarding implementation of the treatment recommendations." (Id.)  Once the DPS Primary Care Provider submits a "UR request[,]" a "UM Nurse," "UM Physician Reviewer," and/or "UM Medical Director (Deputy Medical Director)" will review and determine whether to grant or deny the UR request.  (Id. at 7.)

Dr. Grewal further averred that:

> Based on [his] review of [Plaintiff's medical records] obtained in discovery . . . in this matter, it appears that Plaintiff's prison physician, Dr. Locklear-Jones, submitted a request to the Utilization Review committee for physical therapy on June 23, 2017, the same day that [Dr. Grewal] prescribed physical therapy for Plaintiff. By [Dr. Grewal's] review of [(Docket Entry 44-1 at 2)], the Utilization Review physician, Dr. Jackson, denied the request for physical therapy on July 10, 2017.  [Dr. Grewal] had no involvement with or input into this process, other than recommending that Plaintiff undergo physical therapy, and recommending that this be done with a "rush" priority. [Dr. Grewal] was never contacted regarding this Utilization Review process.

If an inmate does not see improvement with a prescribed treatment, the inmate would need to follow up with health care providers at his prison facility, who would then make a determination of whether or not to send the inmate to a consultation with a specialist, such as the Orthopaedic Clinic at Central Prison.

[Dr. Grewal] ha[s] had no involvement in approving or denying any request from inmates regarding medical care. [Dr. Grewal] ha[s] never had authority to approve or deny an inmate's request for medical care.

When [Dr. Grewal] examined [] Plaintiff, the symptoms that he reported to [Dr. Grewal] and the results of [Dr. Grewal's] physical examination of [Plaintiff] were not consistent with referred leg pain from a pinched nerve in the lumber/lower back area of the spine.

There is no such thing as a "scabbed nerve," and it is not medically possible for a patient's delay in obtaining physical therapy to result in a nerve developing a scab.

(Docket Entry 44-2, ¶¶ 11-15 (internal numbering omitted).)

Plaintiff's medical records from his appointment with Dr. Grewal on June 23, 2017, reflect that, beginning at 8:37 a.m., Dr. Grewal conducted an examination of Plaintiff, diagnosing him with chronic pain in the right knee. (Docket Entry 44-1 at 98.) Based on this assessment, Dr. Grewal made a "New Consultation Request[]" for "Physical Therapy" with "Rush" priority. (Id. (emphasis omitted).) In support of this request, Dr. Grewal explained that Plaintiff "[n]eeds to undergo physical therapy for stretching his [right leg] particularly hamstrings/ITB and core strengthening along with lower back." (Id.) In describing the proposed treatment plan, Dr. Grewal further noted: "ITB syndrome with tight hamstrings. Recommended P[hysical ]T[herapy]. [Follow

up] as needed.  Do activities as tolerated." (Id.)  Finally, the records indicate that Dr. Grewal counseled Plaintiff on this plan of care, as to which Plaintiff "[v]erbalize[d his u]nderstanding." (Id.)  Dr. Grewal completed his report of Plaintiff's appointment at 8:53 a.m. on June 23, 2017.  (See id. at 98-99.)

A few hours later, at 11:09 a.m., medical providers at Scotland C.I. submitted a rush Utilization Review Request for a "PT Evaluation," explaining that Plaintiff "needs to undergo physical therapy for stretching his [right leg] particularly hamstrings/ITB and core strengthening along with lower back." (Id. at 2.)  On July 10, 2017, Dr. Rosemary Jackson "deferred" that request, on the basis that the "guidelines [were] not met." (Id.)  Per Dr. Jackson, the appropriate course remained to "review home exercises and monitor for now[ because Plaintiff] is activity Grade 1 without any functional limitations and currently does not have any official duties that should exacerbate [his condition]." (Id.)

At a medical appointment at Whiteville C.I. on August 16, 2017, Plaintiff again complained about "pain and swelling behind [his] right knee," explaining that he "thought he would be sch[eduled] for P[hysical ]T[herapy]." (Id. at 66.)  At that appointment, per his medical records, Plaintiff experienced slight swelling behind his right knee, as well as increased pain with extension and weight bearing.  (Id. at 67.)  At an appointment on October 23, 2017, a doctor noted that, following injury of his

11

right knee earlier in the year, Plaintiff "[h]ad a[n] MRI done of his right knee[, which] showed edema of the pre-femoral and infra-patella fat pads possibly secondary to impingement. [Plaintiff was s]till having minor swelling, discomfort with prolonged standing and unable to achieve full extension." (Id. at 64.)  That doctor submitted a UR request for an orthopedic referral and scheduled a follow-up appointment for November 6, 2017.  (See id. at 65.)[7] Plaintiff's medical records reflect that, by at least January 11, 2018, he had commenced physical therapy.  (See id. at 63.)

Finally, Plaintiff's sworn opposition to Dr. Grewal's dismissal motion reflects the following:

> In August of 2016[, Plaintiff] submitted [his] first sick-call pertaining to a serious leg injury.  After many months of pain and suffering due to Katy Poole, et al negligen[ce,] on 04/26/17[, Plaintiff] was transferred to Central Prison for an M.R.I.  On 06/23/17[, Plaintiff] was seen by [Dr.] Grewal to receive the results of [his] M.R.I.  and during this appointment [Dr.] Grewal acknowledged the M.R.I. showed no signs of any damage and that no further medical attention would be necessary.  3 months after [Plaintiff's] appointment with [Dr.] Grewal[, Plaintiff] felt as [his] leg was getting wors[e] and there was visible swelling so [he] submitted a sick-call pertaining to ongoing leg injury and was then seen by the provider at Whiteville C[.I.].  During this sick-call visit the provider pulled up the same M.R.I[. that Dr.] Grewal had access to and was puzzled to why [Plaintiff] had not received medical attention beyond the M.R.I[.;] he acknowledged the swelling alone showed sign of a[n] injury.  Whiteville C[.I.] provider made

---

7    Notwithstanding Plaintiff's June 2017 appointment with Dr. Grewal, that doctor also noted on Plaintiff's medical records that Plaintiff "[w]as approved for Orthopedic evaluation 4/17 but never did see the Orthopedist. . . . Needs f[ollow-up] with Orthopedist — as was approved earlier in the year." (Id.)

[Plaintiff] an appointment with an orthopedic immediately
upon reviewing [Plaintiff's] M.R.I[.] shortly after
[Plaintiff] attended [his] first appointment at
OrthoCarolina.  During one of [Plaintiff's] many visits
at OrthoCarolina[,] the Orthopedic viewed the M.R.I[.]
that was taken 04/26/17[,] and was also puzzled to why
[Plaintiff] had not received any medical attention beyond
the M.R.I. and requested [that Plaintiff] start physical
therapy immediately.  During one of [Plaintiff's] many
physical therapy sessions the therapist acknowledged that
the pain [he had] been enduring to [his] leg was coming
from a once pinched nerve in [Plaintiff's] lower back
that ha[d] formed into a scabbed nerve due to the delay
in medical treatment. After viewing comments, notes, etc
from physical therapy sessions [Plaintiff's] orthopedic
diagnosed [him] with a scabbed nerve in [his] lower back.

(Docket Entry 27 at 3-4.)

## C.  **Evidence Regarding Prison Defendants**

In addition to the foregoing, Katy Poole ("Poole"), Carol
Torres ("Torres"), and Beverly Stubbs ("Stubbs") submitted
affidavits and medical records in support of their summary judgment
request (see Docket Entries 48-1 to 48-4), and Plaintiff submitted
a sworn opposition thereto (see Docket Entry 50 ("the Opposition")
at 2, 9).  According to the various Prison Defendants' affidavits:

In January 2017, Poole served as the Correctional Facility
Administrator of Scotland C.I., a role she maintained through at
least May 2019.  (See Docket Entry 48-1, ¶ 3.)  Although she
understood that Plaintiff alleged "that in January of 2017, he sent
[her] a letter in which he informed [her] of numerous complaints he
lodged concerning his injury through the inmate grievance
procedure, sick-calls, and emergency sick calls" (id., ¶ 5), Poole
"ha[d] no recollection of receiving any such letter from

[Plaintiff] in January 2017" (id., ¶ 8). Moreover, she "ha[d] no recollection of being made aware of any grievances, sick-calls, or emergency sick-calls concerning [Plaintiff's] complaints related to his leg injury." (Id., ¶ 9.) Rather, she "only first became aware of [Plaintiff's] complaints related to his leg injury when [she] received notice of this lawsuit." (Id., ¶ 10.) As Correctional Facility Administrator, Poole does not participate in decisions regarding whether, when, or what type of medical care "is provided to an [inmate]" (id., ¶ 11). (See id., ¶¶ 11-13.) Moreover, she "do[es] not supervise staff who perform health service for [inmates], such as nurses, or physicians that contract with the [DPS]" (id., ¶ 14), and she does not review sick-call requests or emergency sick-call requests (see id., ¶ 18).[8] She similarly lacks "involvement in the Utilization Review process, including, the denial or approval of Utilization Review requests, or the scheduling of any approved Utilization Review requests." (Id., ¶ 19.)

Scotland C.I. Correctional Captains likewise do not participate in decisions regarding whether, when, or what type of medical care "is provided to an [inmate]" (id. ¶ 21). (See id., ¶¶ 21-23; Docket Entry 48-2, ¶¶ 8-10.) They also do not review

---

8    When admitted to Scotland C.I., inmates "are instructed that if they believe they are in need of medical attention" (id., ¶ 16) or emergency medical attention, they should submit a sick-call or emergency sick-call request, respectively, for a medical evaluation. (See id., ¶¶ 16-17.)

sick-call or emergency sick-call requests, and they perform no role in the "Utilization Review process, including, the denial or approval of Utilization Review requests, or the scheduling of any approved Utilization Review requests" (Docket Entry 48-1, ¶ 25). (See id., ¶ 24; Docket Entry 48-2, ¶¶ 14-15.) Finally, Correctional Captains at Scotland C.I. "do not supervise staff who perform health service for [inmates], such as nurses, or physicians that contract with the [DPS]." (Docket Entry 48-1, ¶ 26; accord Docket Entry 48-2, ¶ 11.)

Ronald Covington ("Covington") and Torres served as Correctional Captains at Scotland C.I. in January 2017, through at least May 2019. (See Docket Entry 48-1, ¶ 27; Docket Entry 48-2, ¶ 3.) Torres reported "no recollection of having conversations with [Plaintiff] about him seeking medical attention for his leg pain." (Docket Entry 48-2, ¶ 5.) Torres "also ha[d] no recollection of informing [Plaintiff] to put in an emergency sick-call request[] or that [Torres] could not override decisions of medical staff." (Id., ¶ 6.) Instead, Torres "only first became aware of [Plaintiff's] complaints related to his leg injury when [Torres] received notice of this lawsuit." (Id., ¶ 7.)

Finally, through at least May 2019, Stubbs maintained employment at DPS "as a Nurse Supervisor at Scotland [C.I.]," a position she held in January 2017. (Docket Entry 48-3, ¶ 3.) In that position, she "ha[d] no involvement in the Utilization Review

15

process, including, the denial or approval of Utilization Review requests, or the scheduling of any approved Utilization Review requests." (Id., ¶ 21.) She also supervised neither "physicians, whether they [we]re employed by or contract[ed] with [DPS]" (id., ¶ 22), nor "correctional custody staff, such as Correctional Captains, or the Correctional Facility Administrator" (id., ¶ 23).

On January 12, 2017, Stubbs conducted an "examination" of Plaintiff, which she described as "thorough and complete," as well as "based upon his clinical presentation and subjective complaints." (Id., ¶ 20; see also id., ¶ 10.) Plaintiff's "chief complaint was of extreme pain in his right knee, reportedly since August 2016." (Id., ¶ 9.) Stubbs concluded that Plaintiff "had impaired comfort due to his right knee pain" (id., ¶ 11) and provided him "over-the-counter anti-inflammatory medication for five days" (id., ¶ 12). Stubbs further instructed Plaintiff "to ice the affected area in 20 minute intervals for the first 24 hours" (id., ¶ 13)[9] and "to rest, compress, and elevate the affected area" (id., ¶ 14). Stubbs also informed Plaintiff "that his request for a consult with an orthopedic specialist was pending review and approval." (Id., ¶ 15.) Because Plaintiff "was walking with a normal gait and bearing his full weight," Stubbs determined that "crutches were not indicated." (Id., ¶ 18.) The decision not

_____

9 Stubbs specifically denied ordering Plaintiff "to apply ice to his leg for 72 hours." (Id., ¶ 17.)

to provide "crutches was based upon [her] years of training and experience as a nursing professional, and [her] objective assessment of [Plaintiff]." (Id., ¶ 19.)  Finally, "[a]t no time during [her] clinical encounter with [Plaintiff] on January 12, 2017, was [Stubbs] rude or hostile with regard to his reported injuries, or otherwise." (Id., ¶ 16.)

The medical records from Plaintiff's appointment on January 12, 2017, reflect that Plaintiff appeared well, without distress, pain, or visible injury. (Docket Entry 48-4 at 2.)  They further reveal that Plaintiff walked with a normal gait and that his knee displayed a normal active range of motion, without any joint deformity, warmth, swelling, tenderness, or trauma. (Id.)  The records also indicate that, although Plaintiff experienced "Pain on Palpation of Effected Area," his knee appeared "Weight Bearing" without any deformity or loss of function. (Id.)  Accordingly, the records note the following plan of care:  take two tablets of 200 mg ibuprofen three times a day as needed for five days and, "Per [the] Non-Urgent Protocol for joint trauma:  RICE:  Rest Ice Compress Elevate . . . Apply ice for [first twenty-four hours] at 20 minute intervals [three times a day and] ACE Wrap [for] 1-2 weeks," taking the "next available sick call per policy for recheck." (Id. at 2-3.)  Finally, the records indicate that Stubbs conveyed this plan of care to Plaintiff, who "[v]erbalize[d his u]nderstanding." (Id. at 3.)

Additionally, Plaintiff's Opposition contains a "Statement of Facts" which reflects, in pertinent part:

Poole['s] not recalling Plaintiff's complaints related to his leg injury does not mean those direct complaints didn't happen through the written letter, sick-calls, or the grievance procedure. Even if the [C]ourt disregards the sick-calls or the letter due to facility administrators not reviewing sick calls or there being no substantial evidence of the written letter[,] a facility administrator should be aware of grievances submitted by inmates pertaining to serious medical needs as well as other serious matters especially when there are numerous grievances submitted involving such matters. The numerous grievances (emergency grievance included) [Plaintiff] submitted pertaining to [his] injury seeking medical treatment while being housed at Scotland [C.I.,] which is administrated by Defendant Poole[,] are on file and speak for themselves as substantial facts.[10]

. . . [Plaintiff] was a victim of unnecessary and wanton infliction of pain and repeatedly made this aware to [Poole, Covington, and Torres (the "Custodial Defendants")] that the medical staff at the facility was not giving [him] adequate medical attention to help [him] and acknowledged [his] injury was getting wors[e] daily[,] eventually resulting in difficulty getting out [of] bed. Defendants Covington and Torres[,] both Captains at Scotland [C.I.,] acknowledged [Plaintiff that] they couldn't override medical by sending [him] to the hospital, [and] Defendant Poole [Plaintiff] never received a response from. [Prison Defendants' summary judgment evidence] states at Scotland [C.I. inmates] are informed if they believe they need medical attention then they should put in a medical sick-call request for an appointment, and if they believe the need to [be] an emergency they can put in a medical emergency sick-call request. As on file in [Plaintiff's] medical records[, he] followed through with both procedures numerous of times while seeking medical treatment only to be charged each time and be seen by nurses who didn't give physical examinations, couldn't give diagnosis and w[ere] not in the presence of a doctor qualified to inquire into

_____

10   Such grievances do not appear in the record before the Court.

18

essential facts that are necessary to make a professional judgment. Every time [Plaintiff] attended a sick-call appointment[, he] made it [known that he] needed the attention of a qualified [doctor] who give[s] diagnosis and was denied each time. [Plaintiff] acknowledged each defendants [sic] of these encounters.

In addition it states Defendant Stubbs performed a thorough and complete "assessment" of Plaintiff January 12th 2017 not an examination but an assessment. [Plaintiff] declared an emergency sick-call at 1:30AM due to being in excruciating pain in result [he] didn't receive an examination only an assessment. For someone to declare an emergency sick-call in the middle of the night show[s that] the[y are] in need of medical attention beyond a[n] assessment. During this emergency sick-call appointment Defendant Stubbs listed [his] exacerbating factor: Cool air but [she] still prescribed [him] ice which in result increased [his] pain. She was hostile and rude [his] entire visit with her, denied [him] crutches claiming [he] was walking normal bearing [his] full weight. If Defendant Stubbs would have d[one] a thorough examination she would have noticed the swelling in [his] leg and come to a professional judgment [that Plaintiff] putting full weight on [his] leg wouldn't be in [his] best interest. [Plaintiff bore his] full weight by force of being denied crutches [as] it was [his] only way to make it back to [his] dorm. Officer Hunt witnessed this visit and [he and Plaintiff] spoke on the way back to the dorm of Defendant Stubbs['s] unprofessionalism during [Plaintiff's] visit from beginning [until the] end. Defendant Stubbs also charged [Plaintiff] twice for this appointment which is also on file.

(Docket Entry 50 at 2-4.)

## DISCUSSION

### I. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a

motion for summary judgment." Lewis v. Eagleton, 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Barber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Finally, factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

## II.  Deliberate Indifference Standard

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993). To establish a constitutional claim regarding his medical care, Plaintiff must show that Defendants "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

A medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that

even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted). A defendant displays deliberate indifference where he possesses knowledge of the risk of harm to an inmate and knows that "his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994))).

"[D]eliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted). A plaintiff can satisfy this standard by showing "that a [defendant] knew of a substantial risk from the very fact that the risk was obvious." Scinto, 841 F.3d at 226 (internal quotation marks omitted).

A plaintiff can also establish "a prima facie case of deliberate indifference" where "'a substantial risk of [serious

harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it.'" Id. (brackets and ellipsis in original) (quoting Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)). In addition, "'[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs.'" Id. (brackets in original) (quoting Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990), overruled in part on other grounds by Farmer, 511 U.S. at 837). Furthermore, "a significant delay in the treatment of a serious medical condition may, in the proper circumstances," constitute deliberate indifference. Webb v. Hamidullah, 281 F. App'x 159, 166 (4th Cir. 2008). "A[ constitutional] violation only occurs, however, if the delay results in some substantial harm to the patient. Thus, in order to defeat summary judgment on the delay issue, [a plaintiff i]s obligated to establish that the delay in his [treatment] caused him substantial harm . . . ." Id. at 166-67 (footnote omitted); see also Wynn v. Mundo, 367 F. Supp. 2d 832, 838 (M.D.N.C.) ("[T]his court is persuaded that delay in the receipt of medical care only constitutes deliberate indifference where the plaintiff can show that the delay caused substantial harm.") (collecting cases), aff'd, 142 F. App'x 193 (4th Cir. 2005).

Finally, the Eighth Amendment protects a prisoner's right to medical care, but not to the particular medical care that an individual prisoner may demand. See <u>Smith v. Walker</u>, 845 F. Supp. 2d 673, 677 (W.D.N.C.) ("The constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner."), <u>aff'd</u>, 476 F. App'x 417 (4th Cir. 2012). Accordingly, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985) (affirming summary judgment against the plaintiff on deliberate indifference claim where "[the plaintiff] allege[d] that he received inadequate medical treatment while at the clinic, and that he was discharged prematurely by [the defendant medical provider] before he had recovered sufficiently from his injuries," <u>id.</u> at 843, explaining that "[the defendant] and others provided [the plaintiff] with medical treatment on numerous occasions," and that "[the plaintiff's] allegation that his medical care was inadequate would, at most, constitute a claim of medical malpractice," <u>id.</u> at 849). Moreover, generally speaking, "prison non-medical staff are 'entitled to rely' on the competence and expertise of prison health care providers." <u>Moses v. Stewart</u>, No. CV 15-3875, 2017 WL 4326008, at *5 (D. Md. Sept. 26, 2017) (quoting <u>Miltier</u>, 896 F.2d at 854-55).

### III.  Analysis

#### A.  Dr. Grewal

Dr. Grewal moves for summary judgment on the grounds, <u>inter</u> <u>alia</u>, that "the evidence shows that he was not deliberately indifferent to any serious medical need."  (Docket Entry 44 at 13 (emphasis omitted).)  The record substantiates that contention.

Plaintiff has sworn that, on June 23, 2017, Dr. Grewal erroneously informed Plaintiff that his "M.R.I. showed no signs of any damage" and warranted "no further medical attention."  (Docket Entry 27 at 3.)  Plaintiff further has asserted that, approximately three months later, a doctor at Whiteville C.I. reviewed Plaintiff's M.R.I. (<u>see</u> <u>id.</u> at 3) and "was puzzled [as] to why [Plaintiff] had not received medical attention beyond the M.R.I[.] . . . [and] acknowledged the swelling alone showed sign of a[n] injury" (<u>id.</u> at 4).  According to Plaintiff, that doctor immediately scheduled an appointment with an orthopedic doctor, which occurred "shortly [there]after" at OrthoCarolina.  (<u>Id.</u>) Subsequently, an OrthoCarolina doctor prescribed physical therapy, which Plaintiff received, and later "diagnosed [Plaintiff] with a scabbed nerve in [his] lower back," which a physical therapist told Plaintiff occurred "due to the delay in medical treatment."  (<u>Id.</u>)

Notwithstanding Plaintiff's recollection of his conversation with Dr. Grewal, the medical records from June 23, 2017, reflect a diagnosis of "ITB syndrome with tight hamstrings," as to which

Dr. Grewal "recommended P[hysical ]T[herapy]," with "f[ollow-]u[p] as needed." (Docket Entry 44-1 at 98; see Docket Entry 44-2, ¶ 8 ("During [their] appointment, [Dr. Grewal] prescribed physical therapy for Plaintiff, and [Dr. Grewal] explained to him that [he] was prescribing physical therapy. . . . [Dr. Grewal] told [] Plaintiff to participate in physical therapy and to follow up with the Orthopaedic Clinic as needed."); see also Docket Entry 44-1 at 66 (documenting that, at medical appointment on August 16, 2017, Plaintiff indicated that he "thought he would be sch[eduled] for P[hysical ]T[herapy]").) The record further establishes that Dr. Grewal submitted a request for physical therapy for Plaintiff through the prison review process, as a "rush" request. (Docket Entry 44-2, ¶ 8; see also Docket Entry 44-1 at 98.)

Pursuant to DPS policy, physical therapy required preauthorization (see Docket Entry 44-3 at 2-3), and only Plaintiff's then-current DPS doctor could submit the necessary authorization request. (Id. at 6; see also id. at 8.) In light of Dr. Grewal's physical therapy recommendation, Plaintiff's Scotland C.I. medical provider submitted a UR request for physical therapy on June 23, 2017. (Docket Entry 44-1 at 2; see also Docket Entry 44-2, ¶ 11.) However, the UM Physician Reviewer, Dr. Jackson, declined to authorize physical therapy at that point, due to a lack of functional limitation. (Docket Entry 44-1 at 2.) Dr. Grewal played no role in this denial of physical therapy (see id.; see

26

also Docket Entry 44-2, ¶ 13; Docket Entry 44-3 at 6-8), and possessed no authority to compel DPS to permit Plaintiff physical therapy (see Docket Entry 44-3 at 6-8; see also Docket Entry 44-2, ¶¶ 9-10).  Indeed, nothing in the record suggests that Dr. Grewal even knew that DPS rejected his physical therapy recommendation prior to Plaintiff initiating the instant lawsuit.  (See, e.g., Docket Entry 44-2, ¶¶ 6, 10-11, 13.)

Moreover, the record reflects that, in October 2017, a doctor at Whiteville C.I. submitted a UR request for an orthopedic referral and scheduled a follow-up appointment for November 6, 2017.  (See Docket Entry 44-1 at 65; see also Docket Entry 27 at 4.)  Per the Complaint, since Whiteville C.I. decided "to get [Plaintiff] to an orthopedic [doctor,]" he has "been receiving adequate medical attention."  (Docket Entry 2 at 4.)  This medical attention has included physical therapy (see, e.g., Docket Entry 44-1 at 58-63; Docket Entry 27 at 4), as the medical records confirm Dr. Grewal recommended in June 2017 (see Docket Entry 44-1 at 98).  Finally, although Plaintiff has stated that his orthopedic doctor diagnosed him with "a scabbed nerve in [his] lower back," and that a physical therapist attributed the development of that "scabbed nerve . . . to the delay in medical treatment" (Docket Entry 27 at 4), Dr. Grewal has averred that "[t]here is no such thing as a 'scabbed nerve,' and it is not medically possible for a

patient's delay in obtaining physical therapy to result in a nerve developing a scab" (Docket Entry 44-2, ¶ 15).

Accordingly, the evidence shows that, even assuming, as Plaintiff has alleged, that Dr. Grewal erroneously told Plaintiff that the M.R.I. reflected no damage and warranted no further medical treatment (see Docket Entry 27 at 3), Dr. Grewal recorded in Plaintiff's medical records that Plaintiff suffered from "ITB syndrome with tight hamstrings," for which Dr. Grewal "recommended P[hysical ]T[herapy]," with "f[ollow-]u[p] as needed." (Docket Entry 44-1 at 98.) Pursuant to DPS policies, Dr. Grewal possessed no authority over the further course of Plaintiff's care,[11] and could only make recommendations for future treatment, which remained subject to review and approval by Plaintiff's DPS medical providers. (See, e.g., Docket Entry 44-3 at 8.) Moreover, regardless of what Dr. Grewal told Plaintiff, Dr. Grewal submitted a request for Plaintiff to receive physical therapy, which Plaintiff's DPS doctor accepted and submitted for authorization. (Docket Entry 44-1 at 2, 98.) The UM Physician Reviewer declined to authorize physical therapy at that time. (Id. at 2.) Accordingly, Dr. Grewal bears no responsibility for the delay in Plaintiff's receipt of physical therapy.

---

11 Custodial Defendants likewise possessed no authority over Plaintiff's medical care. (See, e.g., Docket Entry 48-1, ¶¶ 11-14, 18-19, 21-26.)

Further, the record contains no competent evidence that any delay in physical therapy caused Plaintiff "substantial harm," Webb, 281 F. App'x at 166. Plaintiff has sworn that his physical therapist told him that the pain in his leg originated "from a once pinched nerve in [his] lower back that has formed into a scabbed nerve due to the delay in medical treatment." (Docket Entry 27 at 4.) However, this statement qualifies as "hearsay because [it is] used to prove the truth of the out of court and unsworn assertions of a non-witness, namely this unidentified [physical therapist]." Solais v. Vesuvio's II Pizza & Grill, Inc., No. 1:15cv227, 2016 WL 1057038, at *3 (M.D.N.C. Mar. 14, 2016) (internal quotation marks omitted). As "[h]earsay in an affidavit constitutes the functional equivalent of an unsworn allegation," id. at *3 n.4, it remains "inadmissible as substantive evidence," id. (internal quotation marks omitted), and "cannot justify [the] grant of summary judgment," id. at *3.[12] Thus, the only admissible evidence before the Court reflects that "[t]here is no such thing as a 'scabbed nerve,' and it is not medically possible for a patient's delay in obtaining physical therapy to result in a nerve developing a scab." (Docket Entry 44-2, ¶ 15.)

---

[12] Even if the Court deemed the physical therapist's statement admissible, Plaintiff has produced no evidence that the three-or-four-month delay between his appointment with Dr. Grewal and his appointment with the doctor at Whiteville C.I. caused such injury, given the ten-month delay between Plaintiff first submitting a sick-call request regarding his leg injury and his appointment with Dr. Grewal. (See Docket Entry 27 at 3-4.)

In sum, the record establishes that Dr. Grewal did not "act[] with 'deliberate indifference' (subjective) to [Plaintiff's] 'serious medical needs' (objective)," Iko, 535 F.3d at 241; see also id. (explaining that, to establish deliberate indifference, an official must possess "*actual knowledge of the risk of harm* to the inmate" and "must *also* have recognized *that his actions were insufficient* to mitigate the risk of harm to the inmate arising from his medical needs" (emphasis in original) (internal quotation marks omitted)).   The Court should therefore grant the Doctor's Motion.

## B.  Prison Defendants

Prison Defendants likewise contend that "the record demonstrates that [they] did not act with deliberate indifference to a serious medical need of Plaintiff."  (Docket Entry 47 at 1.) This contention also merits summary judgment.

### i.  Custodial Defendants

The Complaint maintains that Custodial Defendants "disregarded getting [Plaintiff] adequate medical attention after [he] acknowledged them [that he] was in excruciating pain and had already made several complaints through grievances, sick-calls, as well as 'emergency' sick calls and grievances."  (Docket Entry 2 at 4.)  As evidence in support of this assertion, the Opposition states that Plaintiff informed Custodial Defendants that the Scotland C.I. medical staff "was not giving [him] adequate medical

attention" and that his "injury was getting wors[e] daily."
(Docket Entry 50 at 3.)  Plaintiff also has sworn that each time he
"attended a sick-call appointment[, he] made it [known that] he
needed the attention of a qualified [doctor who could] give
diagnosis and was denied each time." (Id.)  Plaintiff further has
averred that he told Custodial Defendants "of these encounters."
(Id.)  In response, according to Plaintiff, Covington and Torres
told him that "they couldn't override medical by sending [him] to
the hospital" (id.), and Plaintiff received no "response from
[Poole]" (id.).

    In Plaintiff's view, after telling Custodial Defendants that
he "wasn't receiving adequate medical attention at their
facility[,] they should have investigated what was going on and
come to a conclusion that [he] needed to be seen by a [doctor]
qualified to inquire into essential facts necessary to make a
professional judgment." (Id. at 5.)  Plaintiff further has
asserted that, after informing Custodial Defendants "that the
medical attention [he] was receiving for [his] injury which in
conclusion resulted as a pinch nerve in [his] lower back was not
accurate or adequate[,] they did nothing which delayed [him] the
medical attention [he] severely needed." (Id. at 6.)

    As a preliminary matter, Plaintiff's alleged grievances and
letter to Poole do not appear in the record before the Court. (See
Docket Entries dated May 7, 2018, to present.)  Moreover, no

31

evidence exists reflecting Poole's receipt of Plaintiff's letter or grievances. (See, e.g., Docket Entry 48-1, ¶¶ 5-6, 8-10; Docket Entry 50 at 2-7.) Rather, the record reflects that Poole "first became aware of [Plaintiff's] complaints related to his leg injury when [she] received notice of this lawsuit" (Docket Entry 48-1, ¶ 10), which Plaintiff filed after he commenced receiving "adequate medical attention" (Docket Entry 2 at 2). Accordingly, Plaintiff has not shown that Poole "actually kn[e]w of . . . an objectively serious condition, medical need, or risk of harm," De'lonta, 708 F.3d at 525 (internal quotation marks omitted).

Plaintiff likewise has provided insufficient detail regarding his complaints to Torres and Covington, stating only that (1) he made them "aware . . . that the medical staff at the facility was not giving [him] adequate medical attention to help [him] and acknowledged [his] injury was getting wors[e] daily eventually resulting in difficulty getting out [of] bed" (Docket Entry 50 at 3) and (2) he "acknowledged" them of "encounters" with medical professionals in which he requested to see a doctor, but only saw nurses (id.). According to Plaintiff, Torres and Covington responded that "they couldn't override medical by sending [him] to the hospital." (Id.; see also id. (explaining that, when Plaintiff made "numerous" sick-call requests, he was "seen by nurses who didn't give physical examinations, couldn't give diagnosis[,] and w[ere] not in the presence of a doctor qualified to inquire into

32

essential facts that are necessary to make a professional judgment").)

Plaintiff's assertions fail to establish that Covington and Torres "'kn[ew] of and disregard[ed] an excessive risk to [Plaintiff's] health or safety,'" Scinto, 841 F.3d at 225 (first two sets of brackets in original). First, Plaintiff's generalized description of his complaints do not show that he sufficiently alerted Covington and Torres to an objectively serious medical need. (See Docket Entry 50 at 3.) Moreover, regardless of whether they sufficiently conveyed a serious medical need, Plaintiff's complaints explicitly revealed to Torres and Covington that Plaintiff remained under medical care for his injury, attending "numerous" sick-call appointments. (Id.)[13] Although Plaintiff disagreed with the treatment he received and the provision of care by nurses rather than doctors (see id.), disagreements between an inmate and medical provider regarding the inmate's medical care, without more, do not create a constitutional claim, and inmates possess no constitutional right to treatment by a particular type of medical provider. See Wright, 766 F.2d at 849; Smith, 845 F. Supp. 2d at 677.

_____

13 Per Plaintiff's interrogatory responses, which he filed with the Court, he attended six medical appointments at Scotland C.I. between October 2016 and January 2017, with his appointments evenly divided between doctors and nurses. (See Docket Entry 29 at 7.)

Furthermore, as non-medical prison staff, Torres and Covington generally "[we]re 'entitled to rely' on the competence and expertise of prison health care providers," Moses, 2017 WL 4326008, at *5, and Plaintiff's undeveloped, conclusory complaints that "the medical staff at the facility was not giving [him] adequate medical attention to help [him]" (Docket Entry 50 at 3), fails to overcome this presumption. See, e.g., Miltier, 896 F.2d at 854 ("No record evidence suggests why the wardens should not have been entitled to rely upon their health care providers' expertise."); Moses, 2017 WL 4326008, at *5 (granting summary judgment to warden defendants where "there [wa]s no evidence to suggest[] that either [defendant] intentionally delayed his treatment, only that they did not contradict the determinations about that treatment made by medical staff"). Finally, as discussed above, Plaintiff produced no competent evidence that any delay in treatment allegedly attributable to Custodial Defendants caused Plaintiff "substantial harm," Webb, 281 F. App'x at 166. (See generally Docket Entry 44-2, ¶ 15 (explaining that "[t]here is no such thing as a 'scabbed nerve,' and it is not medically possible for a patient's delay in obtaining physical therapy to result in a nerve developing a scab").)[14]

---

14  In this regard, to the extent that Plaintiff criticizes Torres and Covington for failing to "override medical by sending [him] to the hospital" (Docket Entry 50 at 3), which they lacked authority to do (see, e.g., Docket Entry 48-2, ¶¶ 8-11, 14-15), it
(continued...)

Accordingly, the record cannot support a finding that Custodial Defendants "acted with 'deliberate indifference' (subjective) to [Plaintiff's] 'serious medical needs' (objective)." Iko, 535 F.3d at 241. The Court should therefore grant their request for summary judgment.

### ii. Stubbs

Finally, Plaintiff has taken issue with the treatment that he received from Stubbs during his emergency sick-call appointment on January 12, 2017. (See Docket Entry 50 at 3-4.) In particular, he has criticized her for performing "not an examination but an assessment" (see id. at 3), for prescribing him ice even though he identified cool air as an exacerbating factor for his leg injury (see id. at 4), "den[ying him] crutches claiming [he] was walking normal[ly]" (id.), and acting "hostile and rude [during Plaintiff's] entire visit" (id.). To begin, Plaintiff's "assessment-not-examination" critique apparently arises from a misreading of Stubbs's affidavit, which interchangeably describes her actions as an assessment and an examination. (Compare, e.g., Docket Entry 48-3, ¶ 10 ("I performed a complete assessment of [Plaintiff] on January 12, 2017."), and id., ¶ 20 ("My examination of [Plaintiff] was thorough and complete and was based upon his

_____

14(...continued)
also bears noting that Plaintiff does not allege — and his medical records do not reflect — that his subsequent "adequate medical treatment" for his leg injury involved any hospital care (see Docket Entries 2, 44-1).

clinical presentation and subjective complaints."), with Docket Entry 50 at 3 ("[Prison Defendants' summary judgment evidence] states Defendant Stubbs performed a thorough and complete 'assessment' of Plaintiff January 12th 2017 not an examination but an assessment.").) Moreover, Plaintiff has not explained, let alone provided evidence regarding, how an examination differs from an assessment. (See Docket Entry 50 at 3-4.) He likewise failed to offer anything other than speculation that, if Stubbs conducted "a thorough examination[,] she would have noticed the swelling in [his] leg and come to a professional judgment [that Plaintiff] putting full weight on [his] leg wouldn't be in [his] best interest." (Id. at 4.) Such speculation cannot defeat summary judgment. See Lewis, 2010 WL 755636, at *5.

For her part, Stubbs has sworn that her "decision to not provide [Plaintiff] with crutches was based upon [her] years of training and experience as a nursing professional, and [her] objective assessment of [Plaintiff]." (Docket Entry 48-3, ¶ 19; see also id., ¶ 18.) This assessment revealed that Plaintiff's knee displayed a normal range of motion, with no visible swelling, distress, or loss of function. (Docket Entry 48-4 at 2.) As such, Plaintiff has not shown that, by prescribing anti-inflammatory pain medication and the RICE protocol, Stubbs disregarded an excessive risk to Plaintiff's health. In short, on the record before the Court, Plaintiff's complaints about Stubbs's evaluation and

determinations regarding crutches and ice reflect merely a disagreement between an inmate and medical provider concerning appropriate medical care, which does not support a constitutional claim. See Wright, 766 F.2d at 849. In addition, hostility and rudeness, without more, do not establish a constitutional violation. See Wilson v. McKeller, 254 F. App'x 960, 961 (4th Cir. 2007) ("[M]ere threats or verbal abuse, without more, do not state a cognizable claim under § 1983."); Carter v. Morris, 164 F.3d 215, 219 n.3 (4th Cir. 1999) ("[A]lthough [the plaintiff] alleges that individual officers insulted her with racial epithets, such undeniably deplorable and unprofessional behavior does not by itself rise to the level of a constitutional violation.").[15]

Accordingly, Plaintiff has failed to show that Stubbs displayed deliberate indifference to his serious medical needs. See Iko, 535 F.3d at 241. The Court should therefore grant her request for summary judgment.

## CONCLUSION

The record establishes that Defendants did not act with deliberate indifference to Plaintiff's serious medical needs.

---

15    Plaintiff's disagreement with Stubbs's medical determinations (see Docket Entry 50 at 6 (arguing that, "[a]s stated above[, Stubbs] did more than just be hostile and rude")) do not supply the "more" necessary to change this conclusion.

**IT IS THEREFORE RECOMMENDED** that the Doctor's Motion (Docket Entry 43) and the Prison Defendants' Motion (Docket Entry 47) be granted.

This 3rd day of February, 2020.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**